# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JULIA RAMSAY-NOBLES, individually and as Administratrix of the Estate of Karl Taylor, Deceased,<br><br>                    Plaintiff,<br><br>  -against-<br><br>WILLIAM KEYSER, Superintendent of the Sullivan Correctional Facility, in his individual capacity; EDWARD BURNETT, Deputy Superintendent of the Sullivan Correctional Facility, in his individual capacity; BRUCE TUCKER, STEVEN WITTE, and SHANE TOPEL, Correction Officers at the Sullivan Correctional Facility, in their individual capacities; SENIOR SULLIVAN OFFICERS 1-20, in their individual capacities; and SULLIVAN CORRECTION OFFICERS 1-20, in their individual capacities,[1]<br><br>                    Defendants. | **COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br>Civil Action No. _____ |

Plaintiff Julia Ramsay-Nobles, individually and as Administratrix of the Estate of Karl Taylor, for her complaint in this case, alleges the following:

## INTRODUCTION

1.     This is a civil rights action brought by Plaintiff Julia Ramsay-Nobles, individually and as Administratrix of the Estate of Karl Taylor, seeking redress for the death of her brother, Karl Taylor, who was incarcerated at the Sullivan Correctional Facility ("Sullivan") in Fallsburg, New York. On April 13, 2015, Karl Taylor was beaten by Correction Officers ("COs") at Sullivan after he had been restrained, and died as a result.

---

[1] The identities of Senior Sullivan Officers 1-20 and the Sullivan Correction Officers 1-20 will be determined during discovery. The spelling of the Correction Officers' names is phonetic, potentially incomplete, and subject to correction.

2.      Defendants' actions violated Karl Taylor's rights under the Eighth and Fourteenth Amendments of the United States Constitution and 42 U.S.C. §§ 1983 and 1985.  Plaintiff seeks redress for Defendants' acts and omissions that were contrary to the norms of a civilized society, deprived Karl Taylor of civil rights protected by law, and caused his death.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction in this case pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), and 1343 (a)(4) because this is an action for redress for the violation of Karl Taylor's constitutional and civil rights.  Defendants work or worked at Sullivan, where the events giving rise to Plaintiff's claims took place, and are subject to personal jurisdiction.

4.      Venue is proper in the U.S. District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(2) because the events giving rise to Plaintiff's claims took place therein.

## JURY DEMAND

5.      Plaintiff demands a trial by jury in this action on all claims for which jury trial is legally available.

## PARTIES

6.      Karl Taylor was an African-American man who was incarcerated at Sullivan, a maximum security prison located in Fallsburg, New York.  He was 52 years old when he died at Sullivan on April 13, 2015.

7.      Julia Ramsay-Nobles is Mr. Taylor's older sister.  On February 3, 2016, the Surrogate's Court, Sullivan County issued Ms. Ramsay-Nobles Letters of Limited Administration, subsequently amended on April 28, 2016, appointing her the Administratrix of

the Estate of Karl Taylor.  Said Letters remain in full force and effect, and have not been revoked.

8.      At all relevant times herein, upon information and belief, William Keyser was Superintendent of Sullivan.  As Superintendent, Mr. Keyser was the highest-ranking official at Sullivan, and was responsible for the supervision, oversight, and discipline of the uniformed security staff at Sullivan.  He was also responsible for the care, custody, and control of all individuals incarcerated at Sullivan.  While carrying out the acts and omissions alleged herein, Superintendent Keyser was acting under the color of state law and in the scope of his capacity as an agent, servant, or employee of the Department of Corrections and Community Supervision ("DOCCS").  Plaintiff sues Defendant Keyser in his individual capacity.

9.      At all relevant times herein, upon information and belief, Defendant Edward Burnett was Deputy Superintendent of Sullivan.  As Deputy Superintendent, Mr. Burnett was the second-highest ranking official at Sullivan, and with Superintendent Keyser, was responsible for the supervision, oversight, and discipline of the uniformed security staff at Sullivan.  He, with Superintendent Keyser, was also responsible for the care, custody, and control of all individuals incarcerated at Sullivan.  While carrying out the acts and omissions alleged herein, Deputy Superintendent Burnett was acting under the color of state law and in the scope of his capacity as an agent, servant, or employee of the Department of Corrections and Community Supervision ("DOCCS").  Plaintiff sues Defendant Burnett in his individual capacity.

10.     At all relevant times herein, Defendants Senior Officers 1-20 at Sullivan, (collectively, "Senior Sullivan Officers"), whose names are presently unknown, were high-ranking officers at Sullivan, including Sergeants and Captains, who participated in, had knowledge of, or failed to intervene in, the beating that resulted in Mr. Taylor's death.  They also

9063653v.1

participated in, had knowledge of, or failed to intervene in the attempted cover up of the circumstances surrounding Mr. Taylor's death.  At all relevant times herein, Senior Sullivan Officers were acting under the color of state law and within the scope of their capacities as agents, servants, or employees of DOCCS.  Plaintiff sues Defendants Senior Sullivan Officers in their individual capacities.

11.    At all relevant times herein, Defendants Bruce Tucker, Steven Witte, and Shane Topel, were COs at Sullivan.  They were involved in, present during, or on duty during the beating of Mr. Taylor on April 13, 2015.  At all relevant times herein, COs Tucker, Witte, and Topel were acting under color of state law and within the scope of their capacities as agents, servants, or employees of DOCCS.  Plaintiff sues Defendants Tucker, Witte, and Topel in their individual capacities.

12.    At all relevant times herein, Defendants Sullivan Correction Officers 1-20 (collectively, "Sullivan COs"), whose names are presently unknown, were COs at Sullivan who unlawfully abused, harassed, or discriminated against Mr. Taylor; physically assaulted Mr. Taylor without lawful justification; had knowledge of or failed to intervene in this assault on Mr. Taylor; or attempted to cover up the circumstances of Mr. Taylor's death.  At all relevant times herein, Sullivan COs were acting under color of state law and within the scope of their capacities as agents, servants, or employees of DOCCS.  Plaintiff sues Defendants Sullivan COs in their individual capacities.

## STATEMENT OF FACTS

13.    In 1995, Mr. Taylor began serving consecutive New York State prison sentences of 27 to 55 years.

4

9063653v.1

14.     Mr. Taylor was transferred to Sullivan on or about November 25, 2014.  He was housed in the Intermediate Care Program ("ICP"), located in the E North cell block on the East Wing.

15.     Applicable regulations define the ICP as a "therapeutic community" for those with "serious mental illness":

> [The ICP is] a program that includes a separate housing location within a correctional facility designed to address the corrections-based therapeutic treatment of inmates currently diagnosed with what is, generally, a serious mental illness. The ICP is a therapeutic community which provides rehabilitative services to inmates who are unable to function in general population because of their mental illness. The goal of the program is to improve the inmates' ability to function through programming and treatment so that they may return to general population. . . . An ICP is not operated as a disciplinary housing unit.[2]

16.     Sullivan is designated by statute as an ICP Level 1 facility, meaning:

> "[Office of Mental Health] staff is assigned on a full-time basis and able to provide treatment to inmate-patients with a major mental disorder.   The array of available specialized services includes residential crisis treatment, residential/day treatment, case management, medication monitoring by psychiatric nursing staff, and potential commitment to the central New York Psychiatric Center."[3]

17.     While Mr. Taylor was incarcerated at Sullivan, he was arbitrarily singled out for abuse by CO Tucker, Sullivan COs, and Senior Sullivan Officers on the basis of his race, mental health, or other immutable characteristic.  These individuals would routinely isolate, harass, provoke, and inflict arbitrary punishments on Mr. Taylor in the form of physical acts and verbal abuse, which included the use of slurs related to Mr. Taylor's race or mental illness.  CO Tucker, Sullivan COs, and Senior Sullivan Officers that regularly abused Mr. Taylor were white.

---

[2] *See* Residential Mental Health Treatment Units, N.Y. COMP. CODES R. & REGS. tit. 7, § 320.4 (2011).

[3] N.Y. CORR. LAW § 137 (2008).

18.     Upon information and belief, these individuals attempted to provoke Mr. Taylor so that his reaction would supposedly justify their violent, punitive response.

19.     Superintendent Keyser, Deputy Superintendent Burnett, Senior Sullivan Officers, and Sullivan COs knew or should have known that CO Tucker and others targeted Mr. Taylor for abuse and discrimination.  These Defendants failed to take any action to protect Mr. Taylor or stop the violations of Mr. Taylor's rights.

20.     Some weeks or days prior to April 13, 2015, COs entered Mr. Taylor's cell in his absence.  They threw his possession on the floor and squirted shampoo and other liquids onto his belongings.  COs were later heard boasting about having "trashed" Mr. Taylor's cell.

21.     Mr. Taylor thereafter refused to clean his cell.  He stated repeatedly that the COs who trashed his cell should clean it.  COs, including Tucker, repeatedly directed Mr. Taylor to clean his cell.

22.     On the morning of April 13, 2015, there were at least three COs on duty in the area proximate to Mr. Taylor's cell:  Tucker, Witte, and Topel.

23.     CO Tucker began harassing Mr. Taylor, including with regard to cleanliness. Without provocation, CO Tucker then attacked and beat Mr. Taylor, hitting him with a baton. Mr. Taylor called for help, and requested to be taken to "OBS," a safe, solitary space where inmates with mental health issues can be observed.  No help arrived.

24.     After enduring unprovoked blows from CO Tucker, Mr. Taylor grabbed the baton from CO Tucker and hit him with it on his forearm.

25.     Upon information and belief, COs Witte and Topel then tackled Mr. Taylor.  One of them grabbed Mr. Taylor's legs and another grabbed him around his neck.  Together, the COs restrained Mr. Taylor, forced him to the ground, facedown, and handcuffed him.

9063653v.1

26.     Mr. Taylor told the COs that he could not breathe.  Other inmates who could see and hear what was happening from their cells starting yelling to COs Witte and Topel words to the effect of "he can't breathe" and "he's not resisting."  Upon information and belief, the COs did not release Mr. Taylor.

27.     After Mr. Taylor had been restrained facedown, a group of additional Senior Sullivan Officers and Sullivan COs arrived upon the scene.  They further beat, punched, kicked, and otherwise struck Mr. Taylor, even though his hands were tied and he was fully restrained.

28.     One or more of the Defendants shouted racial epithets at Mr. Taylor, including the word "nigger," as they beat him.

29.     By the end of the beating, Mr. Taylor's body was limp but he was still conscious. Upon information and belief, Senior Sullivan Officers and Sullivan COs lifted Mr. Taylor and carried him into the hallway connecting E North to other areas of Sullivan.  Inmates could not see into the hallway from their cells.

30.     Upon information and belief, the officers continued to beat Mr. Taylor in the hallway while he was fully restrained.

31.     Upon information and belief, other officers at Sullivan became aware that Mr. Taylor was being beaten after he had been restrained, but made no effort to intervene or summon assistance.

32.     Mr. Taylor was then dragged to the Sullivan infirmary, leaving a blood trail through parts of the hallway, and thrown onto a bed.  Superintendent Keyser and Deputy Superintendent Burnett entered or were present in the infirmary around this time.

33.     Mr. Taylor was pronounced dead at 9:25 am on April 13, 2015.

9063653v.1

34.    Mr. Taylor's death was caused by injuries inflicted upon him by COs Tucker, Witte, and Topel; Sullivan COs; and Senior Sullivan Officers.

35.    An Autopsy Report conducted on April 13, 2015 noted "blunt impact injuries of the head, torso, and extremities as well as compression of neck injuries." Injuries to the head included contusions on the bridge of the nose, right forehead, upper and lower lips, and a laceration above the left eye. The Medical Examiner noted a "subarachnoid hemorrhage . . . of the left temporal lobe of the brain." Neck injuries included hemorrhages in the "subcutaneous soft tissue of the midline of the neck," the "strap muscles of the neck," and the "midline of the muscles of the posterior aspect of the neck." Mr. Taylor had fractures of his thyroid cartilage and petechiae present in his conjunctivae.

36.    Mr. Taylor's "manner of death" was listed in the Autopsy Report as "homicide."

37.    After Mr. Taylor was taken to the infirmary, several Sullivan COs or inmates assigned to "blood spill" cleaned up Mr. Taylor's blood and other evidence of the beating. Sullivan COs or inmates, at COs' instruction, bleached or painted over Mr. Taylor's cell, and disposed of Mr. Taylor's personal effects.

38.    In the immediate aftermath of Mr. Taylor's death, Sullivan COs told inmates that they would be "thrown in the hole" if they spoke to investigators about what had happened. Upon information and belief, inmates were sent to solitary confinement after witnessing what happened to Mr. Taylor or speaking out.

39.    Shortly after Mr. Taylor's death, New York State investigators arrived at Sullivan and interviewed inmates about Mr. Taylor's beating and death. Some inmates declined to speak with investigators or tell investigators what they had seen, for fear of retaliation.

9063653v.1

40.     Investigators told at least one inmate that part of the events leading to Mr. Taylor's death had been captured on video, which at least one of the investigators had watched.

41.     Upon information and belief, Defendants conspired to beat Mr. Taylor and cover up their role in the events that led to Mr. Taylor's death.  Upon information and belief, their actions included:

    a.   Hiding evidence of Mr. Taylor's beating by cleaning up Mr. Taylor's blood before New York State investigators arrived, cleaning, bleaching, and painting over Mr. Taylor's cell, as well as the areas where he was beaten, and disposing of Mr. Taylor's clothes or personal effects;

    b.   Threatening potential witnesses and retaliating against witnesses who spoke out about how Mr. Taylor was killed;

    c.   Jointly devising a false, exculpatory version of the events of April 13, 2015, which would be told to investigating authorities;

    d.   Lying to New York State investigators about the events of April 13, 2015;

    e.   Using the New York State Correction Officers and Police Benevolent Association ("NYSCOPBA") to propagate a false narrative of the events surrounding Mr. Taylor's death, including falsely claiming that Mr. Taylor had started the fight with CO Tucker by "punching [CO Tucker] in the head"[4];

    f.   Coordinating false testimony that was presented to a grand jury assembled by the Sullivan County District Attorney;

    g.   Otherwise suppressing incriminating information.

---

[4] NYSCOPBA News from the Field, http://www.nyscopba.org/news-field (last visited Feb. 5, 2016).

9

42.     Mr. Taylor's autopsy report was prepared on and dated April 13, 2015, the day he was killed.  However, in or about August 2015, officials from the Sullivan County Coroner's Office falsely represented to the media and Mr. Taylor's next-of-kin that the autopsy had not been completed.[5]

43.     After Mr. Taylor died, a person at Sullivan whose identity is unknown called Ms. Ramsay-Nobles and told her that Mr. Taylor was "code blue."  She was provided with no further information.

44.     After Mr. Taylor died, Sullivan officials did not release any of Mr. Taylor's personal property to Ms. Ramsay-Nobles, even after she identified herself as his next of kin. DOCCS did send Ms. Ramsay-Nobles a check dated April 15, 2015 for two dollars.

45.     Defendants contributed to or permitted a culture at Sullivan whereby Sullivan COs abused or discriminated against incarcerated people at Sullivan, and this abuse and discrimination was concealed or otherwise covered up.  Defendants failed to establish and implement policies that would protect inmates' civil rights, and failed to supervise, train or monitor COs at Sullivan under their charge.

46.     Upon information and belief, Superintendent Keyser, Deputy Superintendent Burnett, and Senior Sullivan Officers were aware of or deliberately indifferent to a pattern and practice of COs' abuse of inmates, including Mr. Taylor.  Defendants knew or should have known that CO Tucker, Senior Sullivan Officers, and Sullivan COs had a history of abuse and violence towards inmates with mental illness, including Mr. Taylor.  Upon information and belief, Superintendent Keyser, Deputy Superintendent Burnett, and Senior Sullivan Officers

---

[5] *See, e.g.*, Crimesider Staff, Group wants federal probe of NY prisons expanded, CBS NEWS, (August 21, 2015, 8:03 am), http://www.cbsnews.com/news/group-wants-federal-probe-of-ny-prisons-expanded/.

9063653v.1

knew that Sullivan COs, and CO Tucker in particular, would target inmates suffering from mental illness because they were less likely to complain or report misconduct.

47.     Inmates had on numerous occasions reported CO Tucker's, Senior Sullivan Officers', and Sullivan COs' abusive and racist treatment to higher-ranking Sullivan officials. Additionally, Senior Sullivan Officers knew or should have known that Sullivan COs would sometimes deliberately fail to process inmate grievances alleging COs' abusive conduct.

## FIRST CAUSE OF ACTION
### Against All Defendants under 42 U.S.C. § 1983

48.     Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs 1-47 above with the same force and effect as if fully set forth herein.

49.     The acts of Defendants constituted conduct under color of state law that deprived Mr. Taylor of rights, privileges, and immunities secured by the Constitution and laws of the United States, including the Eighth and Fourteenth Amendments.

50.     The Supreme Court has emphasized that "the Eighth Amendment places restraints on prison officials, who may not . . . use excessive physical force against prisoners."[6] "Being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society," and COs who engage in such assaults under color of law are violating the Eighth Amendment.[7]

51.     Upon information and belief, Senior Sullivan Officers; Sullivan COs; and COs Tucker, Witte, and Topel, used excessive and unlawful force against Mr. Taylor, maliciously and with the intent and purpose of causing harm. This force constituted cruel and unusual punishment, and ultimately, Mr. Taylor's death.

---

[6] *Farmer v. Brown*, 511 U.S. 825, 832 (1994) (citations omitted).

[7] *Id.* at 834 (internal quotations and citations omitted).

9063653v.1

52.     Mr. Taylor was intentionally treated differently from similarly-situated individuals without rational basis, or was discriminated against based on race.  Evidence of this disparate treatment can be found in the previous paragraphs, and includes CO Tucker, Senior Sullivan Officers, and Sullivan COs singling out Mr. Taylor for abuse, harassment, and arbitrary punishment; repeated physical and verbal abuse including racial slurs; and use of racial slurs while beating Mr. Taylor after he had been restrained on April 13, 2015, the date of his death. These officers were motivated by discriminatory animus.

53.     Defendants Superintendent Keyser, Deputy Superintendent Burnett, and Senior Sullivan Officers permitted, tolerated, caused, knew about, should have known about, or were deliberately indifferent or grossly negligent to a pattern and practice of severe abuse and neglect, constituting torture, against inmates at Sullivan prior to and during the time of Mr. Taylor's death; the practice of racially discriminatory treatment of incarcerated individuals, including Mr. Taylor; and the arbitrary targeting of Mr. Taylor for abuse and punishment.  Despite this knowledge, these Defendants consciously permitted the custom or practice of severe physical abuse, emotional abuse, neglect, and discrimination to continue.  Their failure to take measures to curb this pattern of abuse and discrimination constituted acquiescence of the known unlawful behavior of their subordinates, and deliberate indifference to the rights and safety of the incarcerated individuals in their care and custody, and specifically, Mr. Taylor.  These Defendants were grossly negligent or failed to supervise, train, and oversee COs at Sullivan. Their conduct deprived Mr. Taylor of his rights, and was a substantial factor in the continuation of such abuse, a proximate cause of Constitutional violations alleged in this complaint, and ultimately, the cause of Mr. Taylor's death.

54.     Defendants had an affirmative duty and reasonable opportunity to intervene, on behalf of Mr. Taylor, to prevent his beating, discrimination, the use of force that resulted in Mr. Taylor's death, and the attempted cover-up of the violation of Mr. Taylor's Constitutional rights, but due to their intentional conduct or deliberate indifference, failed to do so.

55.     Defendants committed the acts alleged herein intentionally, willfully, wantonly, maliciously, sadistically, or with such reckless disregard of the consequences as to reveal a conscious indifference to the clear risk of death or serious injury to Mr. Taylor that shocks the conscience.  Defendants are liable for punitive damages.

## SECOND CAUSE OF ACTION
### Against All Defendants under 42 U.S.C. § 1983 for
### Conspiring to Violate the Eighth and Fourteenth Amendments

56.     Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs 1-55 above with the same force and effect as if fully set forth herein.

57.     Acting under the color of state law, Defendants conspired and acted in concert to deprive Mr. Taylor of his Constitutional rights, including the rights to be free from cruel and unusual punishment, arbitrary targeting, or racial discrimination.  As a direct and proximate result of the conduct alleged herein, Defendants contributed to, knew of, or failed to intervene in the fatal beating of Mr. Taylor at the hands of COs at Sullivan.  In committing the acts and omissions complained of herein, Defendants also breached their affirmative duty to intervene to protect Mr. Taylor's Constitutional rights from infringement by other law enforcement officers in their presence.

58.     Upon information and belief, in furtherance of the conspiracy to contribute to and cover up the acts of brutality against Mr. Taylor on April 13, 2015, Defendants' actions included:

9063653v.1

a.  Hiding evidence of Mr. Taylor's beating by cleaning up Mr. Taylor's blood before New York State investigators arrived, cleaning, bleaching, and painting over Mr. Taylor's cell, as well as the areas where he was beaten, and disposing of Mr. Taylor's clothes or personal effects;

b.  Threatening potential witnesses and retaliating against witnesses who spoke out about how Mr. Taylor was killed;

c.  Jointly devising a false, exculpatory version of the events of April 13, 2015, which would be told to investigating authorities;

d.  Lying to New York State investigators about the events of April 13, 2015;

e.  Using the NYSCOPBA, to propagate a false narrative of the events surrounding Mr. Taylor's death, including falsely claiming that Mr. Taylor had started the fight with CO Tucker by "punching [CO Tucker] in the head"[8];

f.  Coordinating false testimony that was presented to a grand jury assembled by the Sullivan County District Attorney;

g.  Otherwise suppressing incriminating information.

59.     Defendants committed the foregoing acts intentionally, willfully, wantonly, maliciously, or with such reckless disregard of the consequences as to reveal a conscious indifference to the clear risk of death or serious injury to Mr. Taylor that shocks the conscience. Defendants are liable for punitive damages.

---

[8] NYSCOPBA News from the Field, http://www.nyscopba.org/news-field (last visited Feb. 5, 2016).

9063653v.1

### THIRD CAUSE OF ACTION
### Against All Defendants under 42 U.S.C. § 1985(2)
### for Conspiring to Impede the Due Course of Justice

60.     Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs 1-59 above with the same force and effect as if fully set forth herein.

61.     Defendants conspired together to impede the due course of justice, interfering with the federal and state judicial processes, with the intent of denying Mr. Taylor and his Estate the equal protection of the laws.

62.     Defendants intimidated witnesses, destroyed evidence, and otherwise covered up their violations of Mr. Taylor's rights, as enumerated in the previous paragraphs.

63.     As a direct and proximate result of Defendants' conduct, Plaintiff claims as damages pecuniary loss including medical expenses, funeral expenses and lost earnings, as well as non-economic damages, including conscious pain, mental anguish, and physical injury suffered by Mr. Taylor prior to his death and the consequential loss of enjoyment of life.

64.     Defendants committed the foregoing acts intentionally, willfully, wantonly, maliciously, or with such reckless disregard of the consequences as to reveal a conscious indifference to the clear risk of death or serious injury to Mr. Taylor that shocks the conscience. Defendants are liable for punitive damages.

9063653v.1

## FOURTH CAUSE OF ACTION
### Against All Defendants under 42 U.S.C. § 1985(3)
### for Conspiring to Interfere with Civil Rights

65.     Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs 1-64 above with the same force and effect as if fully set forth herein.

66.     Defendants participated in and knew of the conspiracy to deprive Mr. Taylor of the equal protection of the law on the basis of his race.  They had the power and ability to prevent the conspiracy, but refused or neglected to do so.

67.     CO Tucker, Senior Sullivan Officers, and Sullivan COs regularly called Mr. Taylor racial slurs and epithets from around the time that he arrived at Sullivan, and in particular, on the day that they beat him to death.  This racial abuse was primarily or exclusively initiated by white officers.

68.     CO Tucker, Senior Sullivan Officers, and Sullivan COs notoriously and frequently abused Mr. Taylor, both physically and verbally, and subjected him to arbitrary punishment.  Upon information and belief, they attempted to provoke Mr. Taylor so that his reaction would justify their violence response.

69.     In furtherance of their conspiracy, all Defendants subjected Mr. Taylor to unlawful acts, thereby depriving him of his rights to the equal protection of the laws and equal privileges and immunities under the laws in contravention of the Fourteenth Amendment of the United States Constitution.  Defendants also took overt acts to participate in or cover up their violations of Mr. Taylor's rights, as enumerated in the previous paragraphs, interfering with state and federal judicial processes.

70.     As a direct and proximate result of Defendants' conduct, Plaintiff claims as damages pecuniary loss, including medical expenses, funeral expenses and lost earnings, as well

9063653v.1

as non-economic damages, including conscious pain, mental anguish, and physical injury

suffered by Mr. Taylor prior to his death, and the consequential loss of enjoyment of life.

71.     Defendants committed the foregoing acts intentionally, willfully, wantonly,

maliciously, or with such reckless disregard of the consequences as to reveal a conscious

indifference to the clear risk of death or serious injury to Mr. Taylor that shocks the conscience.

Defendants are liable for punitive damages.

## DEMAND FOR RELIEF

**WHEREFORE**, Plaintiff demands the following relief against Defendants, jointly and

severally:

(a)     Compensatory damages in an amount just and reasonable and in conformity with

evidence at trial;

(b)     Punitive damages to the extent allowable by law;

(c)     Attorneys' fees;

(d)     The costs and disbursements of this action;

(e)     Interest;

(f)     Such other and further relief as the Court deems just and proper.

Dated:     New York, NY
           July 20, 2016

PATTERSON BELKNAP WEBB & TYLER LLP

By: _____
Eugene M. Gelernter
Adeel A. Mangi
Daniel M. Eisenberg
1133 Avenue of the Americas
New York, NY 10036
212-336-2000
*Attorneys for Plaintiff Julia Ramsay-Nobles,*
*Individually and as Administratrix of the Estate of*
*Karl Taylor*

17

9063653v.1