**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JULIA RAMSAY-NOBLES, individually and as Administratrix of the Estate of Karl Taylor, Deceased,<br><br>                       Plaintiff,<br><br>     -against-<br><br>WILLIAM KEYSER et al.,<br><br>                   Defendants. | Case No. 16-cv-05778 (CM)(BCM) |

**PLAINTIFF'S OPPOSITION TO MOTION FOR**
**SUMMARY JUDGMENT BY THE CORRECTION OFFICER DEFENDANTS'**

PATTERSON BELKNAP WEBB & TYLER LLP
Eugene M. Gelernter (emgelernter@pbwt.com)
Adeel A. Mangi (aamangi@pbwt.com)
Daniel M. Eisenberg (dmeisenberg@pbwt.com)
1133 Avenue of the Americas
New York, NY 10036
(212) 336-2000

*Attorneys for Plaintiff Julia Ramsay-Nobles,*
*Individually and as Administratrix of the Estate of*
*Karl Taylor*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...........................................................................................1

STATEMENT OF FACTS ................................................................................................2

    A.    Mr. Taylor Is Harassed by Officer Tucker.................................................3

    B.    The April 13, 2015 Fight on E North.......................................................4

    C.    COs Beat and Choked Mr. Taylor In The Hallway ................................7

    D.    Mr. Taylor's Autopsy Confirms That He Died From Being Beaten and Choked ..................................................................................................9

    E.    The Cover-Up .........................................................................................11

ARGUMENT .................................................................................................................13

I.     The CO Defendants Have Not Demonstrated An Absence of Disputed Facts.................13

II.    Summary Judgment Is Inappropriate on Plaintiff's § 1983 Claims...............................14

    A.    Disputed Facts Preclude Summary Judgment on the Excessive Force Claim .....................................................................................................14

III.   Disputed Facts Preclude Summary Judgment on Plaintiff's Conspiracy Claims ............17

    A.    The Intracorporate Conspiracy Doctrine Does Not Preclude Conspiracies Between Corrections Officers............................................18

    B.    There Is Ample Evidence that the CO Defendants Conspired to Violate Mr. Taylor's Civil Rights, and Then Covered It Up.............................19

    C.    There is Ample Evidence that the CO Defendants Conspired to Deny Mr. Taylor Equal Protection of the Law ................................................22

IV.   Qualified Immunity Is Inapplicable .........................................................................24

CONCLUSION ...............................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adickes v. S. H. Kress & Co.*,
  398 U.S. 144 (1970)..................................................................................20

*Ali v. Connick*,
  136 F. Supp. 3d 270 (E.D.N.Y. 2015) ............................................18, 19

*Ali v. Szabo*,
  81 F. Supp. 2d 447 (S.D.N.Y. 1999)..........................................................25

*Anderson v. City of N.Y.*,
  No. 1:16-cv-02583 (ALC), 2019 U.S. Dist. LEXIS 54126
  (S.D.N.Y. Mar. 28, 2019) ........................................................................15

*Anemone v. Metro. Transp. Auth.*,
  410 F. Supp. 2d 255 (S.D.N.Y. 2006)............................................18, 19

*Annunziato v. The Gan, Inc.*,
  744 F.2d 244 (2d Cir. 1984)......................................................................20

*Baskerville v. Goord*,
  1998 U.S. Dist. LEXIS 176031 (S.D.N.Y. Nov. 5, 1998)................23, 24

*Bond v. Bd. of Educ. of the City of N.Y.*,
  No. 97-cv-1337, 1999 U.S. Dist. LEXIS 3164 (E.D.N.Y. Mar. 17, 1999)............................18

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)..................................................................................14

*Cole v. Fischer*,
  379 F. App'x 40 (2d Cir. 2010) ..........................................................23, 24

*Crawford v. Cuomo*,
  796 F.3d 252 (2d Cir. 2015).....................................................................15

*Edwards v. Annucci*,
  No. 17-cv-5018 (VB), 2019 U.S. Dist. LEXIS 45868
  (S.D.N.Y. Mar. 19, 2019) ........................................................................19

*Farmer v. Brennan*,
  511 U.S. 825 (1994)..................................................................................15

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Fernandez v. DeLeno*,
    71 F. Supp. 2d 224 (S.D.N.Y. 1999).......................................................................13

*Fischl v. Armitage*,
    128 F.3d 50 (2d Cir. 1997)............................................................................16, 17

*Girard v. 94th St. & Fifth Ave. Corp.*,
    530 F.2d 66 (2d Cir. 1976)..................................................................................18

*Harlow v. Fitzgerald*,
    457 U.S. 800 (1982)............................................................................................24

*Herrmann v. Moore*,
    576 F.2d 453 (2d Cir. 1978)...............................................................................18

*Hill v. City of N.Y.*,
    No. 03-cv-1293, 2005 U.S. Dist. LEXIS 38926 (E.D.N.Y. Dec. 29, 2005)....................20, 22

*Jeffreys v. Rossi*,
    275 F. Supp. 2d 463 (S.D.N.Y. 2003)...........................................................15, 16

*LeBlanc-Sternberg v. Fletcher*,
    143 F.3d 765 (2d Cir. 1998)...............................................................................20

*Lifeng Chen v. New Trend Apparel, Inc.*,
    8 F. Supp. 3d 406 (S.D.N.Y. 2014) ...................................................................13

*Lloyde v. Lord*,
    No. 94-cv-484, 1997 U.S. Dist. LEXIS 2978 (S.D.N.Y. March 19, 1997) ...........................25

*Marvel Characters, Inc. v. Simon*,
    310 F.3d 280 (2d Cir. 2002)...........................................................................2, 21

*Moffitt v. Town of Brookfield*,
    950 F.2d 880 (2d Cir. 1991)...............................................................................15

*Monell v. Dep't of Social Servs.*,
    436 U.S. 658 (1978)............................................................................................15

*Pangburn v. Culbertson*,
    200 F.3d 65 (2d Cir. 1999).................................................................................19

*Pressley v. City of N.Y.*,
    No. 11-cv-3234, 2013 U.S. Dist. LEXIS 5374 (E.D.N.Y. Jan. 11, 2013) ........................18, 19

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Puglisi v. Underhill Park Taxpayer Assoc.*,
  947 F. Supp. 673 (S.D.N.Y. 1996) ..................................................................20, 21

*Purcell v. Coughlin*,
  790 F.2d 263 (2d Cir. 1986)...........................................................................23

*Ricciuti v. New York City Transit Auth.*,
  124 F.3d 123 (2d Cir. 1997)....................................................................16, 17, 20

*Rounseville v. Zahl*,
  13 F.3d 625 (2d Cir. 1994)..............................................................................20

*Skorupski v. County of Suffolk*,
  652 F. Supp. 690 (E.D.N.Y. 1987) .................................................................16, 17

*Thomas v. Mao-Fong Hsiao*,
  No. 12-cv-1128, 2012 U.S. Dist. LEXIS 166482 (E.D.N.Y. Nov. 20, 2012) ........13

*Thomas v. Roach*,
  165 F.3d 137 (2d Cir. 1999)........................................................................23, 24

*United States v. Rivera*,
  971 F.2d 876 (2d Cir. 1992)............................................................................20

*United States v. Rubin*,
  844 F.2d 979 (2d Cir. 1988)........................................................................20, 22

*Vilkhu v. City of N.Y.*,
  No. 06-cv-2095, 2008 U.S. Dist. LEXIS 36454 (E.D.N.Y. May 5, 2008) ............23

*Whitley v. Albers*,
  475 U.S. 312 (1986)....................................................................................15

*Wright v. Goord*,
  554 F.3d 255 (2d Cir. 2009)..........................................................................15

## Statutes

42 U.S.C. § 1983.................................................................................. *passim*

42 U.S.C. § 1985.................................................................................. *passim*

## Other Authorities

U.S. Const. amend. VIII.........................................................................14, 15, 17

# TABLE OF AUTHORITIES
**(continued)**

**Page(s)**

U.S. Const. amend. XIV ............................................................................................14, 17

Local Civil Rule Rule 56.1 ...........................................................................................1, 13

## PRELIMINARY STATEMENT

The CO Defendants[1] Rule 56.1 statement, Dkt. No. 275-3, is two pages long.  Eight of its twelve statements cite Plaintiff's Second Amended Complaint, but generally, unrelated paragraphs therein; three cite nothing at all; and the twelfth is a legal conclusion that there is "no legally actionable proof in this case."  *Id.*  The CO Defendants' Rule 56.1 statement fails to identify the purportedly undisputed facts they rely on in this motion.  By itself, that warrants denial of summary judgment.[2]

But even if the Court reaches the merits, this case is not amenable to summary judgment. The crux of Plaintiff's claims against the CO Defendants is that they beat and choked her incarcerated brother, Karl Taylor, after he was retrained, resulting in his death.  These allegations are borne out by extensive evidence, such as medical evidence that Mr. Taylor died from his physical injuries, which included neck compression, a fractured Adam's Apple, eight blunt force impacts to his head and face, and brain bleeding.  The CO Defendants were the only possible sources of these injuries:  they were with him from time when he left his cell around 8:15 AM on April 13, 2015, to when he was pronounced dead at 9:25 AM.  None of the CO Defendants has any explanation for Mr. Taylor's injuries—they all deny having choked or beaten him, or having seen anyone else do so.  Meanwhile, several inmate eye witnesses saw Mr. Taylor being beaten and choked by corrections officers in both the cell block and hallway, and others spent hours cleaning up blood in the hallway.

---

[1] The CO Defendants are Defendants Bunch, Frunzi, Daddezio, Santos, Walter, Weir, Steinberg, Darling, Tucker, Witte and Topel.  The remaining Defendants, represented by other counsel, are Superintendent Keyser, Deputy Superintendent Burnett, and Dr. Seung-Ho Lee.

[2] The CO Defendants' failure to provide a meaningful Rule 56.1 Statement is consistent with their prior conduct in this case.  They delayed the close of discovery by months by failing to comply with numerous discovery orders.  *See* Dkt. Nos. 237 (Court Order stating that the CO Defendants had failed to comply with their discovery obligations); 230 (Court Order sanctioning the CO Defendants $9,855 for discovery violations); 278 (Court Order sanctioning the CO Defendants $16,528.50 for discovery violations).

Despite this, the CO Defendants argue that there is no evidence to support Plaintiff's civil rights and conspiracy claims. They argue, for example, that Plaintiff cannot prove their personal involvement, a requirement for § 1983 claims, because the "prisoner-witness[es]" do not identify them "by name." The law requires no such thing. The CO Defendants also argue Plaintiff cannot prove that they "agreed" to conspire, despite evidence that they shared a common purpose in violating Mr. Taylor's rights, obscured inculpatory evidence, and attempted to cover-up their role in Mr. Taylor's death. This motion should be denied so that a jury can weigh the evidence and determine how Mr. Taylor died.

## STATEMENT OF FACTS

Karl Taylor, Plaintiff's brother, was an African-American man diagnosed with serious mental illness shortly after he was incarcerated in 1995. Decl. of Jeremy H. Colley, M.D., Ex. 1 at 2-3. He was 56 years old when he died on April 13, 2015 after being beaten and choked by the CO Defendants. During his incarceration, Mr. Taylor was transferred between New York State prisons, where he alternated between extended periods of solitary confinement, predominantly for minor infractions of prison rules, and mental health wards. Ex. 1 at Taylor000103-14; Ex. 2 at Taylor000176-187.[3] The facts set forth below are based largely on eye-witness testimony of inmates who were incarcerated at the Sullivan Correctional Facility ("Sullivan"). Some of these facts are disputed by the CO Defendants, but all of them must be accepted as true for purposes of this summary judgment motion. *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002).

---

[3] As used herein, "Ex. __" refers to Exhibits to the accompanying Declaration of Daniel M. Eisenberg, unless otherwise indicated.

### A.    Mr. Taylor Is Harassed by Officer Tucker

On November 25, 2014, Mr. Taylor was transferred to Sullivan, and specifically, to the Intermediate Care Program on the E North cell block, a unit for inmates with serious mental illness.  Mr. Taylor needed help with basic self-care, such as keeping himself and his cell clean. Ex. 3 at 14:15-16:7.  For that reason, he was assigned to the Assisted Daily Living program, where inmate porters, officers, or prison staff would give him support.  *Id.* at 17:7-11.

For the six months that Mr. Taylor was at Sullivan prior to his death, he was "taunted practically every day . . .  from the first day that he got there[.]"  *Id.* at 20:15-22:5.  Mr. Taylor was treated "different[ly]" from other inmates:  he was "like [the COs'] fresh meat."  *Id.* at 57:9-21.  The COs—and Defendant Tucker in particular—would call him "nigger, monkey, all different type of stuff," and told him "he's a piece of shit."  Ex. 4 at 38:14-24; *see also* Ex. 3 at 38:7-39:7; Ex. 5 at 61:16-63:12.  This "went on every day."  Ex. 3 at 20:15-22:5.

Defendant Tucker's mistreatment of Mr. Taylor was the most severe.  Tucker was a "bull[y] to guys that was [sic] in the [mental health] area."  Ex. 6 at 97:8-10.  Tucker would regularly "take his stick out of the holster and have it in his hand as if, you know, he's ready to bust you in the head or something."  *Id.* at 99:6-10.  Tucker's behavior was "like an intimidation thing, because there's no reason to have your stick out if nothing is happening."  *Id.* at 99:25-100:6.  "Mr. Taylor was especially the one that [Tucker] was always going after."  Ex. 3 at 47:18-48:2.  The "[o]nly time [Tucker] spoke with Mr. Taylor was when he was threatening him."  Ex. 4 at 38:19-25.  As another CO affirmed, Tucker "hated" him.  Ex. 5 at 53:9-14. Defendant Tucker would tell Mr. Taylor:  "I'm going to get you mother fucker, I'm going to get you."  Ex. 3 at 23:14-18.

Mr. Taylor responded to these persistent threats and harassment by seeking refuge in his cell or transfer to an isolation area in the prison's Mental Health Unit.  Ex. 3 at 22:16-23:3.

Other inmates observed his reclusive behavior, and its link to Defendant Tucker. Mr. Taylor wanted "no contact with nobody." Ex. 7 at 30:3-16. Mr. Taylor told one of his friends on the block: "I don't want to come out no more to eat breakfast in the dining area with the rest of the guys because [Tucker] . . . keeps on harassing me." *Id.* Mr. Taylor was worried that if he left his cell to take a shower, "somebody was going to go in there and beat him up . . . or something like that nature." Ex. 4 at 15:14-19.

The predictable consequence of Mr. Taylor's refusal to leave his cell—particularly in light of his mental illness—was that his hygiene and self-care deteriorated. Ex. 8 at 186:11-187:16. Yet, this incited an even more punitive response. Defendant Tucker would "[t]urn off his water; throw water at [him], not feed him." Ex. 4 at 40:4-25.

Some weeks before Mr. Taylor's death, Defendant Tucker's harassment of Mr. Taylor escalated. Tucker and other COs "trashed" Mr. Taylor's cell while he was off the cell block. Ex. 3 at 27:6-29:19. Defendant Tucker and these other COs threw Mr. Taylor's mattress and personal effects on the floor, and squirted lotion and shampoo over them. *Id.* When Mr. Taylor returned to his cell, he refused to clean up the mess—he insisted that the COs who made the mess should clean it up. *Id.* at 36:23-41:11. Over the next few weeks, supervisors, such as Defendants Keyser and Burnett, would visit the E North cell block and comment on the condition of Mr. Taylor's cell, instructing COs to "get [Mr. Taylor] to clean this shit up, it looks like a pig's pen." *Id.* at 65:8-68:6.

### B.     The April 13, 2015 Fight on E North

Defendant Tucker's threats to Mr. Taylor came to a head the morning of April 13, 2015. On that day, Defendant Tucker entered the E North cell block and instructed Jeffrey Hunt, a non-party CO assigned to the E North control room, to "crack Taylor out"—meaning, open Mr. Taylor's cell. Ex. 5 at 99:25. On other days, Mr. Taylor, and other inmates in the Assisted Daily

4

Living program were "not supposed to come out of their cells until there [was] a . . . mental health worker" on the block. Ex. 3 at 25:16-26:2. That morning, no mental health staff member was present. *Id.* at 76:16-77:3. As CO Hunt testified, he "had a feeling maybe things ain't going to work out too good." Ex. 5 at 100:1-100:2.

Defendant Tucker approached Mr. Taylor's cell, banged on his gate with his baton out, and shouted, loud enough for other inmates to hear: "come out of the fucking cell, motherfucker." Ex. 3 at 76:8-76:21. Mr. Taylor left his cell and headed straight towards the "sergeant's desk," where he asked Defendant Topel to "call the captain, call the sergeant, call somebody," *Id.* at 77:9-78:5, "I want to go to [the Mental Health Unit], I want to go to the [observation] cell," Ex. 7 at 42:24-43:6. "Tucker yelled back[:] you're not going to go to no fuckin' OBS cell and you're not going to see no [Mental Health Unit] . . . go clean your fuckin' self up, go clean your cell . . . take a fuckin' shower or we're going to . . . have fuckin' problems." *Id.* at 43:6-9, 43:20-44:8, 52:20-53:4.

Defendant Tucker then "struck Mr. Taylor unexpectedly" with his "club." *Id.* at 44:4-14. "[Y]ou could hear the stick hit on his head." Ex. 3 at 76:9-78:14. It was "like a clumping sound, like a crunching hit, hard crunching thump hit on his head." *Id.* at 80:6-8. Tucker proceeded to strike Mr. Taylor's body with the baton a "few" times. *Id.* at 76:9-78:14.

"Mr. Taylor started screaming and panicked." Ex. 7 at 44:13-16. He headed towards the exit of the cell block, *id.* at 44:12-16, which was down a flight of stairs, through a sunken area known as the pit. This was a futile endeavor: the cell block gates would remain locked until opened by a CO. Defendant Tucker followed Mr. Taylor. By the time the two men had entered into the pit, "Tucker [had] hit Mr. Taylor a few [] times with the stick." Ex. 3 at 83:22-24. With no way out, "Mr. Taylor just broke crazy. He just got really, really mad because [] Tucker kept

hitting him." *Id.* at 83:24-89:20.  Mr. Taylor turned back towards Tucker, collided with him, and managed to wrestle away the baton.  Ex. 7 at 44:15-17.  Then, Mr. Taylor swung at Defendant Tucker, Ex. 3 at 89:21-25, and hit him with the baton at least once.  *Id.* at 83:20-84:18.

The two other COs on the cellblock, Defendants Topel and Witte, tackled Mr. Taylor, who landed face-down.  Ex. 9 at 116:11-14.  Topel was "on top of his torso . . . holding the baton on the ground."  *Id.* at 117:21-24.  Witte "grabb[ed] Mr. Taylor's knees."  *Id.* at 118:11-14. While Mr. Taylor and Defendant Topel were struggling on the ground, Defendant Topel claimed that they were exchanging blows.  *Id.* at 109:11-22.  But Topel notes that he was careful to avoid Mr. Taylor's neck area.  He never put Mr. Taylor in a "headlock," never put his arm "around [Mr. Taylor's neck," never put his "hands around [Mr. Taylor's] neck," nor put "the baton around [Mr. Taylor's] neck."  *Id.* at 128:14-129:8.

During this struggle, Defendant Tucker "[p]ulled the p[i]n" on his radio, calling for backup.  Ex. 3 at 96:1-16.  In rushed Defendants Santos, Steinberg, Walter, Darling, and Weir. Ex. 10 at 12:25-14:9, 14:20-16:14; Ex. 11 at 31:5-20.  They helped apply handcuffs to Mr. Taylor, who at that point, had been pinned down.  Ex. 10 at 13:13-25, 14:2-15:3.  Moments later, Defendants Daddezio, Frunzi, and Bunch also arrived.  Ex. 41, 42 & 34.  Some of the CO Defendants started "beating on [Mr. Taylor]."  Ex. 3 at 96:22-97:24.  Inmates on the block could hear Mr. Taylor say "he can't breathe."  *Id*.  But the Defendants kept "beating him, beating him, and beating . . . him" even after he was restrained.  *Id*.  *See also* Ex. 6 at 88:15-89:13.  The officers instructed inmates in their cells to "get off the gate," meaning, back up into your cells; this would prevent them from seeing what was happening on the block.  *Id.* at 110:23-111:3.

Finally, the CO Defendants lifted Mr. Taylor to his feet and walked him off the cell block towards the Sullivan infirmary.  Ex. 7 at 131:17-132:3.  Despite having suffered blows, Mr.

Taylor had no significant visible injuries. He "looked calm"; he was not bleeding. *Id.* at 64:13-66:16. "[H]e was walking, he was breathing, he was alive." *Id.* at 64:13-66:16.

### C.    COs Beat and Choked Mr. Taylor In The Hallway

There are several hallways connecting the E North cell block with the Sullivan infirmary; the trip takes about 5 minutes when walking at a normal pace. Ex. 12 at 94:19-21. On April 13, 2015, the trip took almost 20 minutes. *Id.* at 94:22-95:2, 117:11-117:20.

The hallways at Sullivan are not surveilled. While there are stationary cameras affixed to the walls or ceiling in some parts, the majority of these cameras are "off" by default setting. Ex. 13 at 341:7-17. In any event, it is common knowledge among COs and inmates that the hallway have "blindspots"—areas that cameras do not cover. Ex. 5 at 202:8-19; Ex. 14 at 176:14-23; Ex. 6 at 57:4-16. These hidden areas give COs free rein to "tune-up" inmates, particularly in retaliation for striking an officer. Ex. 5 at 205:5-206:7 ("Q. And why do they beat inmates in the hallways? A. Listen, you just -- you know, an officer gets assaulted, well, you know, it's payback time to the inmate that did it. Q. Who pays the inmate back in that type of situation? A. Whoever . . . Whoever is escorting them down to medical or box or whatever.") (counsel's objections omitted).[4]

Mr. Taylor, hands handcuffed behind his back, was transported through the hallways by seven of the CO Defendants: Bunch, Frunzi, Darling, Steinberg, Walter, and Daddezio, and Santos. Defendant Darling was "hold[ing] [Mr. Taylor's] left shoulder," and Defendant Daddezio held Mr. Taylor's right shoulder. Ex. 10 at 22:23-23:7, 29:24-30:2; Ex. 40. The others

---

[4] *See also* Ex. 17 at 109:3-109:17 (Q. "[A tune-up] is when [] an inmate needed 'correction' meaning, he needed to be punished or taught a lesson; is that fair? A. That is fair."); Ex. 18 at 206:3-15 ("Q. You have heard of officers talking about [tuning up inmates] at Sullivan? A. Yeah."); Ex. 6 at 57:4-16 ("Q. Like I said, there's no video cameras [in the hallways], there's very limited movement, and once they pull the pin, the hallways are cleared, so anything can actually happen []." ).

walked in front or behind. Ex. 15 at 49:6-11. Although not walking with Mr. Taylor, the four remaining CO Defendants, Tucker, Witte, Topel, and Weir passed the escort on the way to the infirmary.[5] At some point on the morning of April 13, 2015, all eleven CO Defendants were in the un-surveilled hallways with Mr. Taylor at the same time.

It is typical practice at Sullivan to "lock down" the prison following a fight, and return all inmates to their cells. Ex. 13 at 24:16-22. But on the morning of April 13, 2015, some inmates were in transit between the cell blocks and the prison infirmary. Kurtis Williams was one of these inmates.[6] On his way back to E North from the infirmary, he encountered Mr. Taylor and the escort. He heard officers call Mr. Taylor "nigger[] and monkey" as they struck him with "the stick, and then [] started choking him out . . . and beating him in his head []." Ex. 4 at 24:10-13, 25:8-20. Mr. Taylor was on the ground and "[Tucker] had his foot on his neck punching him in his face, and that's when Sergeant Frunzi ran down with his black gloves on and that's when they continued to viciously, brutally beat Mr. Taylor." *Id.* at 23:6-11. Williams observed that Mr. Taylor "was bleeding, blood everywhere. He had a swollen face, marks on his face. Basically just bloody to me." *Id.* at 34:9-13. The CO Defendants told Williams to "turn and face the wall." *Id.* at 30:2-13.

Williams' deposition testimony was consistent with the statement he had provided to investigators shortly after Mr. Taylor's death. *See* Ex. 43. It also is corroborated by affidavits from two other inmates, Steven Lovett and Stacy Liggan, who were directed to clean blood in these hallways on the morning of April 13, 2015. Lovett found "puddles" of blood in certain

---

[5] Ex. 16 at 115:20-116:23 (Tucker and Witte see Mr. Taylor in the hallway); Ex. 9 at 141:4-6 (testimony by Defendant Topel that he did not see Mr. Taylor in the infirmary, suggesting he arrived before Mr. Taylor despite leaving the cellblock after him); Ex. 11 at 48:19-51:11 (seeing Mr. Taylor in the hallway).

[6] *See also* Ex. 7 at 67:18-68:3 ("there was people later on who claimed that they heard some screaming and yelling in the hallways that they were going through for programs or coming back from gym or whatever, and [] saw blood trails in the [] hallways.").

areas and "drops of blood" in others. Ex. 22. Liggan recalled "a lot of blood in the hallway on the floor in thick drops from [infirmary] to E-block." Ex. 23. It took the two of them approximately an hour and a half to clean it up. Ex. 22. Prison records confirm that Lovett and Liggan cleaned blood for over three hours the morning of April 13, 2015. Ex. 24.

When Mr. Taylor finally arrived at the clinic—carried "face-down" the last part of the way, Ex. 15 at 67:15-69:3—medical staff observed he was "not showing signs of life." Ex. 12 at 63:8-8. He was pronounced dead at 9:25 AM. Ex. 25 at TAYLOR000004.

Gregory Judge, an inmate who saw what had happened in the cellblock, posed at deposition a central question in this case: "Because [Mr. Taylor] walked out of the block . . . how do you get from point A, walking, and reach point B and you're dead[?]" Ex. 6 at 88:15-89:13. The CO Defendants provide no answer. But an expert witness retained by their counsel, Gregory Mazarin, M.D., does. Dr. Mazarin, retained by the CO Defendants to evaluate Defendant Tucker's injuries from his fight with Mr. Taylor, opined:

> [B]ased on my review of the medical records from the correctional facility for Karl Taylor, the [] inured officers, the autopsy report and numerous depositions [of CO Defendants and inmate witnesses] . . . and based upon my years of experience . . . ***it is apparent that any alleged choking must have occurred later in the hallway and not during the altercation in the housing unit [].***

Ex. 26 at 1-2 (emphasis added).

### D. Mr. Taylor's Autopsy Confirms That He Died From Being Beaten and Choked

Sullivan County retained Dr. Margaret Prial, a non-party forensic pathologist, to perform an autopsy. The autopsy revealed extensive, fatal bodily injuries, which were later documented in Dr. Prial's Autopsy Report, and confirmed by Dr. Zhongxue Hua, Plaintiff's forensic pathology expert. *See* Decl. of Zhongxue Hua, M.D.-P.hD., Ex. 1 ("Hua Rep."). None of the Defendants retained a medical expert to opine on Mr. Taylor's injuries or cause of death. None

of them have any basis for disputing Dr. Prial's and Dr. Hua's medical conclusions or analysis, which are consistent.

Mr. Taylor's most significant injuries were severe trauma to his neck, including fractured cornuae (also known as the Adam's Apple), extensive hemorrhages of his neck muscles, and multiple petechiae (burst blood vessels in the eyes typically resulting from restrictions in blood flow to the head). Ex. 29 at KT00000054; Ex. 21 at 208:19-25; Hua Rep. at 7-8. Dr. Prial explained in her deposition that these injuries can be caused by "[a]n instrument or a hand on the neck pressing the neck," "a ligature, such as a rope when someone is hanging [or] it can be from another person's hands, fingers, or an instrument." Ex. 21 at 123:4-6, 124:19-125:4. The CO Defendants' only explanation for Mr. Taylor's neck injuries is that Mr. Taylor's shirt had "bunch[ed] up." Ex. 15 at 74:17-75:6.

Dr. Prial testified that Mr. Taylor also sustained approximately eight blunt force impacts to his head, which caused contusions on his face, forehead, eyes, nose, and lips, as well as bleeding in his brain. Ex. 21 at 109:4-22; *see also* Hua Rep. at 4-5. She also testified these injuries were consistent with force from "a blunt instrument . . . something like potentially a pipe . . . [b]ut potentially a baton. It could be a stick . . . [or] the edge of a shoe." Ex. 21 at 104:19-105:12. The Autopsy Report also detailed various internal and external hemorrhages to his body, both front and back, consistent with "punches, kicks, and/or baton strikes." Hua Rep. at 4-5. *See also* Ex. 21 at 108:3-109:10.[7]

Dr. Prial concluded that Mr. Taylor's physical injuries were incurred during a "physical altercation(s) with correction officers at Sullivan," and his cause of death was either asphyxiation

---

[7] For example, there was evidence of multiple hemorrhages on Mr. Taylor's collar bone region, right upper back, and left upper back. He also had hemorrhages within the adipose tissues adjacent to his adrenal glands, which are located just above the kidneys. There were abrasions on his right knee, lower leg, left upper arm, right upper arm, and left elbow, among other areas. Ex. 25 at KT00000054-58.

(deprivation of oxygen) or cardiac arrhythmia (stress-induced hormone spike disrupting heart rhythm).  *Id.* at 193:22-197:5.  Dr. Hua agreed.  Hua Rep. at 7-8.  No one disagrees.

### E.      The Cover-Up

Shortly after Defendants Tucker and Witte arrived at the Sullivan infirmary on the morning of April 13, 2015, they met Defendant Weir.  They told him that Mr. Taylor had started the fight by "punch[ing]" Tucker, and then taking his baton and "swinging."  Ex. 11 at 82:7-25. This contradicted eye witnesses' testimony, *see, e.g.*, Ex. 3 at 87:2-88:4; Ex. 7 at 44:9-17, and the medical evidence:  neither the Autopsy Report nor photographs taking during the autopsy show bruising to Mr. Taylor's hands or knuckles consistent with his punching CO Tucker on April 13, 2015.  Ex. 21 at 113:23-114:25; Hua Rep. at 5.

Next, Defendant Weir went to an area of Sullivan known as the "Chart Room" to fill out paperwork.  There, he met CO Defendants Walter, Santos, Daddezio, Steinberg, Bunch, and Frunzi—the Defendants who transported Mr. Taylor in the hallway—among other officers.  Ex. 18 at 184:24-25; Ex. 14 at 126:19-128:14.  In the Chart Room, the supervisors, including Defendant Frunzi, oversaw the officers' completion of paperwork, and in particular, their written narrative of the events of April 13, 2015.  Defendant Walter testified that he told Defendant Frunzi what he planned to write in his "to/from" report, and asked for his approval.  Ex. 18 at 183:7-184:7 ("[I asked him] [i]s this okay if I write this?  Is this okay?"  Sgt. Frunzi said whether it was "okay or not.").  Walter wrote multiple draft reports.  *Id.* at 186:25-187:2 ("more than two").  As to the prior draft(s):  he "rip[ed] it up, shred[ed] it" using the shredder in the room.  *Id.* at 186:25-187:2.

The Chart Room meeting was not the only opportunity for the CO Defendants to coordinate their statements.  Verizon phone logs that Plaintiff subpoenaed reveal that Defendants Frunzi and Bunch spoke on the phone on April 14, the day after Mr. Taylor died, as well as April

17, 23, and 29. Ex. 30. Defendant Tucker spoke with Defendant Topel on April 14, 15, and 17, *id.*, with Sgt. Frunzi on April 13, 14, 18, 19, 22, and 25, *id.*, and with Defendant Weir on April 14. Ex. 11 110:13-23. Defendant Witte spoke with Defendant Topel on April 15, 17, and 18. Ex. 30. The CO Defendants also texted with each other about the events of April 13, 2015, their impending state grand jury testimony about the same, and this lawsuit. *See, e.g.*, Ex. 31 at Taylor0006802-4 (Tucker: "How did it go today bud you feel good or bad.?" Topel: ". . . . I knocked it out of the park. They are giving there [sic] decision Monday." Tucker: "Can I call you in a bit" Topel: "Yeah").

The CO Defendants' testimony and written statements about the events of April 13, 2015 provide no explanation for the injuries reported in Dr. Prial's Autopsy Report, even though they were the only people with him from the moment he left his cell until he was carried to the infirmary face down and showing no signs of life. The CO Defendants all characterize Mr. Taylor as the aggressor either in the cell block or in the hallway, even after Mr. Taylor had been restrained.[8] But one non-party CO initially told a different story, Ex. 5 at 106:8-9 ("Tucker took the first swing with the baton, yes."), and so do numerous inmates who saw what happened. Ex. 7 at 53:9-54:12 (same); Ex. 20 at 24:13-25:5 (same); Ex. 3 at 76:16-78:14 (same).

The CO Defendants also deny that there was blood in the hallway,[9] even though it took two inmates an hour and a half to clean it up.[10] And one of the CO Defendants, Bunch, even

---

[8] *See* Ex. 25 at TAYLOR000001-70 (Unusual Incident Report with statements from all eleven CO Defendants, among others); Ex. 34 (Bunch); Ex. 42 (Daddezio); Ex. 41 (Frunzi); Ex. 40 (Santos); Ex. 39 (Steinberg); Ex. 38 (Weir); Ex. 37 (Walter); Ex. 32 (Tucker); Ex. 35 (Darling); Ex. 33 (Topel); Ex. 36 (Witte).

[9] *See, e.g.*, Ex. 10 at 46:13-47:3 ("Q. And so is it correct that at no point did you see any visible injuries to Mr. Taylor? A. That is correct. Q. And at no point you saw any blood coming from Mr. Taylor? A. That is correct. Q. And at no point did you see Mr. Taylor in any visible medical distress? A. Correct.); Ex. 19 at 105:5-7 ("Q. Well, do you recall any blood being in the hallway? A. I don't.").

[10] Exs. 22-24.

claimed that he had "a little bit of a conversation" with Mr. Taylor in the infirmary,[11] even though medical staff testified that when Mr. Taylor arrived at the infirmary he showed no signed of life.  Ex. 12 at 63:8-18.

## ARGUMENT

## I.    The CO Defendants Have Not Demonstrated An Absence of Disputed Facts

Local Civil Rule 56.1(d) requires that every assertion in a 56.1 Statement of Material Facts "be followed by citation to evidence which would be admissible []."  Courts within the Second Circuit routinely deny motions for summary judgment that are unsupported by a properly cited statement of material facts.  *See, e.g.*, *Thomas v. Mao-Fong Hsiao*, No. 12-cv-1128, 2012 U.S. Dist. LEXIS 166482, at *2-3 (E.D.N.Y. Nov. 20, 2012) (denying defendant's summary judgment motion because "[n]one of the facts that it asserts are undisputed are followed by citation to admissible evidence, as required by Local Rule 56.1(d)."); *Lifeng Chen v. New Trend Apparel, Inc.*, 8 F. Supp. 3d 406, 458-59 (S.D.N.Y. 2014) (denying summary judgment on all "claims that are premised on the unsupported assertions of fact."); *Fernandez v. DeLeno*, 71 F. Supp. 2d 224, 227 (S.D.N.Y. 1999) (same).

As noted above, the CO Defendants' Rule 56.1 Statement of Material Facts is two pages long.  Eight of its twelve statements cite Plaintiff's Second Amended Complaint, but generally, the wrong paragraphs therein; three have no citation at all; and the twelfth is a legal conclusion that there is "no legally actionable proof in this case."  Dkt. No. 275-3.  Their motion violates Local Civil Rule 56.1(d), and can be denied on those grounds alone.

---

[11] *See* Ex. 15 at 74:17-75:6 ("I noticed that his shirt was bunching up, and I said to inmate Taylor I said is this tight on you?  And he was like (indicating) yes, and he was like making this noise so I . . . cut his shirt as the officer that was in the room reached under his sweat shirt and popped the buttons on his shirt to open up his collar and then he said oh, thanks, man. I appreciate it, and so we had a little bit of a conversation.").

Regardless, the CO Defendants have not come close to the standard for prevailing on summary judgment. The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (citation omitted). This burden can be met discharged by "showing . . . that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325 (internal quotation marks omitted). Here, The CO Defendants have plainly not met their burden. They cite no documents or testimony from a voluminous discovery record; they offer no reason for this Court to believe that Plaintiff cannot prove each element of her claims; and they admit that "the parties differ as to the facts," Dkt. No. 275-2 (hereinafter "CO Br.") at 3.

## II.    Summary Judgment Is Inappropriate on Plaintiff's § 1983 Claims

Plaintiff asserts three claims under 42 U.S.C. § 1983 against the CO Defendants. Those claims allege: (1) excessive force in violation of the 8th Amendment; (2) disparate treatment on the basis of race or other immutable characteristic in violation of the 14th Amendment; and (3) failure to protect Mr. Taylor from this excessive force and disparate treatment. Dkt. No. 106 (SAC) at ¶¶ 78-85. The CO Defendants do not seek summary judgment on Plaintiff's disparate treatment and failure-to-protect claims under § 1983. Those claims are not the subject of any motion and they are ready for trial.

### A.    Disputed Facts Preclude Summary Judgment on the Excessive Force Claim

The CO Defendants' sole basis for seeking summary judgment on Plaintiff's excessive force claim under § 1983 is that "the extensive prisoner-witness depositions only identify one officer, Bruce Tucker." CO Br. at 4. That mischaracterizes the testimony of the inmate

witnesses.  It also ignores overwhelming evidence that the CO Defendants caused—and were the only possible cause of—Mr. Taylor's injuries.

Section 1983 authorizes suit to redress a violation of the U.S. constitution by a state or municipal government official.  *See Monell v. Dep't of Social Servs.*, 436 U.S. 658, 695–701 (1978).  The 8th Amendment to the Constitution protects inmates against the excessive use of force.  As the Supreme Court has explained, "[b]eing violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society."  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

To establish an excessive force claim under § 1983, a plaintiff must meet an objective and subjective element.  *Whitley v. Albers*, 475 U.S. 312, 327 (1986).  With respect to the objective element, the harm has to be "sufficiently serious to reach constitutional dimensions," *Crawford v. Cuomo*, 796 F.3d 252, 256 (2d Cir. 2015) (citation and quotation marks omitted).  With respect to the subjective element, the defendant must have "the necessary level of culpability, shown by actions characterized by 'wantonness' in light of the particular circumstances surrounding the challenged conduct."  *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009).  The extent of an inmate's injury may suggest "whether the use of force could plausibly have been thought necessary."  *Anderson v. City of N.Y.*, No. 1:16-cv-02583 (ALC), 2019 U.S. Dist. LEXIS 54126, at *18-19 (S.D.N.Y. Mar. 28, 2019) (citation and quotation omitted).

The Second Circuit requires the "personal involvement of defendants in alleged constitutional deprivations."  *Moffitt v. Town of Brookfield*, 950 F.2d 880, 886 (2d Cir. 1991).  However, "[a] plaintiff need not establish who, among a group of officers, directly participated in the attack and who failed to intervene."  *Jeffreys v. Rossi*, 275 F. Supp. 2d 463, 474 (S.D.N.Y.

15

2003). An officer is "personally involved in the use of force if he either: (1) directly participates in an assault; or (2) was present during the assault yet failed to intercede on behalf of the victim even though he had a reasonable opportunity to do so." *Id.* (citing *Ricciuti v. New York City Transit Auth.*, 124 F.3d 123, 129 (2d Cir. 1997)). *See also Fischl v. Armitage*, 128 F.3d 50, 57 (2d Cir. 1997) (affirming a finding that a defendant was personally involved in an excessive use of force when he was in the vicinity of the attack on plaintiff and did nothing to stop it); *Skorupski v. County of Suffolk*, 652 F. Supp. 690, 694 (E.D.N.Y. 1987) (denying defendants summary judgment even though plaintiff could not specify which of the officers struck him).

The CO Defendants were with Mr. Taylor from the moment he left his cell on the morning of April 13, 2015 until he arrived at the Sullivan infirmary in a lifeless state with extensive injuries to his head, neck and body, and signs of having been choked. Ex. 12 at 63:12-15; Ex. 29 at KT00000054-58. The injuries described in Dr. Prial's Autopsy Report could only have been inflicted by the CO Defendants.

The CO Defendants' assertion that the "prisoner-witness depositions only identify one officer, Bruce Tucker," CO Br. at 4, is factually incorrect. As detailed above, an eye-witness described COs beating and choking Mr. Taylor in the hallway, including Defendant Frunzi.[12] Moreover, while they deny inappropriate conduct, each of the CO Defendants has admitted, in statements that they provided to investigators and in deposition testimony, that they used force against Mr. Taylor on April 13, 2015.[13] Even if a particular CO Defendant did not cause Mr. Taylor's fatal injuries, all of them admittedly were present, and not one of them contends that he

---

[12] *See, e.g.*, Ex. 4 Tr. at 21:4-12 (identifying Defendant Frunzi); Ex. 43 at SullivanDA00001734 (Williams' statement to investigators identifying Defendant Frunzi).

[13] *See, e.g.*, Ex. 25 at TAYLOR000001-70 (Unusual Incident Report with statements from all eleven CO Defendants, among others); Ex. 34 (Bunch); Ex. 42 (Daddezio); Ex. 41 (Frunzi); Ex. 40 (Santos); Ex. 39 (Steinberg); Ex. 38 (Weir); Ex. 37 (Walter); Ex. 32 (Tucker); Ex. 35 (Darling); Ex. 33 (Topel); Ex. 36 at (Witte).

tried to intercede to prevent Mr. Taylor's injuries.  As discussed above, that is enough for

liability for excessive use of force under § 1983.  Regardless of whether a particular CO

Defendant beat and choked Mr. Taylor or failed to intervene when other CO Defendants were

beating and choking him, all of them are liable for excessive force under § 1983.  *See Ricciuti*,

124 F.3d at 129; *Fischl*, 128 F.3d at 57; *Skorupski*, 652 F. Supp. at 694.

## III.    Disputed Facts Preclude Summary Judgment on Plaintiff's Conspiracy Claims

The CO Defendants seek summary judgment on portions of Plaintiff's Second, Third, and

Fourth Causes of Action, which allege:  (1) conspiracy to violate Mr. Taylor's Eighth

Amendment rights (§ 1983); (2) conspiracy to impede the due course of justice (§ 1985(2)),

which Plaintiff hereby abandons[14]; and (3) conspiracy to interfere with Mr. Taylor's civil rights

(§ 1985(3)).  The CO Defendants do not seek summary judgment on Plaintiff's claim under

§ 1983 of a conspiracy to violate Plaintiff's Fourteenth Amendment rights.

For each of the challenged claims, the CO Defendants assert essentially the same

arguments:  (a) that a conspiracy between DOCCS officers working at the same prison cannot

exist as a matter of law, CO Br. at 7, 10, & 13; (b) that Plaintiff cannot prove the CO Defendants

agreed to conspire, CO Br. at 8, 10, & 13; and (c) that Plaintiff cannot prove the CO Defendants

acted with racial animus, a requirement for claims under § 1985(3) (CO Br. at 14).  These

arguments mischaracterize relevant law, and in any event, are contradicted by record evidence.

---

[14] The Second Amended Complaint alleges that the CO Defendants' conspired to intimidate inmate witnesses against testifying in this civil rights case.  Dkt. No. 106 (SAC) at ¶¶ 90-94.  While Plaintiff's fact investigation revealed that inmate witnesses were in fact threatened, Plaintiff voluntarily consents to dismiss these claims with prejudice to focus the issues for trial.

### A.    The Intracorporate Conspiracy Doctrine Does Not Preclude Conspiracies Between Corrections Officers

The CO Defendants argue that that the intracorporate conspiracy doctrine bars a claim alleging a conspiracy between DOCCS officers working at the same prison.  CO Br. at 7, 10, & 13.  That is incorrect.

The intracorporate conspiracy doctrine bars conspiracy claims under 42 U.S.C. § 1985 where "the conspiratorial conduct challenged is essentially a single act by a single corporation, acting exclusively through its own directors, officers, and employees, each acting within the scope of his employment."  *Herrmann v. Moore*, 576 F.2d 453, 459 (2d Cir. 1978).  *See also Anemone v. Metro. Transp. Auth.*, 410 F. Supp. 2d 255, 271 (S.D.N.Y. 2006) ("where individual defendants are all employees of the *institutional defendant*, a claim of conspiracy will not stand") (citation omitted) (emphasis added).  While some district courts in this Circuit have found that this doctrine can also apply to claims of a conspiracy to violate § 1983, the Second Circuit has not reached the question.  *See Ali v. Connick*, 136 F. Supp. 3d 270, 282-83 (E.D.N.Y. 2015).

Nevertheless, the intracorporate conspiracy doctrine is inapplicable here because this case comes within the "personal stake" exception, which provides that "conspiracy claims against individuals within a single entity [are not barred] when they are pursuing interests wholly separate and apart from the entity."  *Bond v. Bd. of Educ. of the City of N.Y.*, No. 97-cv-1337, 1999 U.S. Dist. LEXIS 3164, at *6 (E.D.N.Y. Mar. 17, 1999) (exception applies to § 1983 conspiracy claims).  *See also Pressley v. City of N.Y.*, No. 11-cv-3234, 2013 U.S. Dist. LEXIS 5374, at *36-37 (E.D.N.Y. Jan. 11, 2013) (exception applies to § 1985 claims).

For the personal stake exception to apply, the plaintiff must show that defendants "acted other than in the course of their corporate duties."  *Girard v. 94th St. & Fifth Ave. Corp.*, 530 F.2d 66, 71 (2d Cir. 1976) (internal quotation marks and citation omitted).  A CO's violation of

an inmate's constitutional rights is, of course, "outside the course" of his or her duties as an officer of the state. *See, e.g.*, *Edwards v. Annucci*, No. 17-cv-5018 (VB), 2019 U.S. Dist. LEXIS 45868, at *23-24 (S.D.N.Y. Mar. 19, 2019) ("Employing excessive force and falsifying documents are not core functions performed in the normal course of a correction officer's duties."); *Ali*, 136 F. Supp. 3d at 283 (the personal stake exception applied in cases when correction officer defendants "covered up the use of excessive force, engaged in race-based false arrests . . . and "assaulted a prisoner in retaliation for his participation in a federal lawsuit.").

Here, Plaintiff's conspiracy claims fall squarely within the "personal stake" exception to the intracorporate conspiracy doctrine. Plaintiff's civil rights claims are rooted in "excessive force and falsifying [testimony]"—they concern misconduct manifestly outside the "core functions . . . of a correction officer's duties," *Edwards*, 2019 U.S. Dist. LEXIS 45868, at *23-24. Beating and choking an inmate who has been handcuffed and restrained, resulting in the inmate's death, furthers no institutional objective, *Pressley*, 2013 U.S. Dist. LEXIS 5374, at *36-37. In addition, Plaintiff's complaint does not name any institution as a defendant, as required for the intracorporate conspiracy doctrine to apply. *See Anemone*, 410 F. Supp. 2d at 271. The intracorporate conspiracy doctrine does not bar Plaintiff's conspiracy claims.

### B.    There Is Ample Evidence that the CO Defendants Conspired to Violate Mr. Taylor's Civil Rights, and Then Covered It Up

The CO Defendants also argue that Plaintiff "has offered no evidence that would demonstrate the existence of a 'meeting of the minds' between any of the defendants" to violate Mr. Taylor's rights. CO Br. at 9. This ignores the factual record.

A conspiracy requires, *inter alia*, "an agreement." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999) (citation omitted). To prove an "agreement," a plaintiff "must establish that there was a 'meeting of the minds', 'conspiracy', 'preconceived plan', or 'mutual understanding'

or 'concerted action'."  *Puglisi v. Underhill Park Taxpayer Assoc.*, 947 F. Supp. 673, 704

(S.D.N.Y. 1996) (quoting *Annunziato v. The Gan, Inc.*, 744 F.2d 244, 251 (2d Cir. 1984)).

Because "[c]onspiracies are by their very nature secretive operations that can hardly ever be

proven by direct evidence," *Rounseville v. Zahl*, 13 F.3d 625, 632 (2d Cir. 1994), "the elements

[] may be established through circumstantial evidence," *United States v. Rivera*, 971 F.2d 876,

890 (2d Cir. 1992).  At the summary judgment stage, circumstantial evidence of an agreement

need only be sufficient for a jury to "infer," *Hill v. City of N.Y.*, No. 03-cv-1293, 2005 U.S. Dist.

LEXIS 38926, at *16-17 (E.D.N.Y. Dec. 29, 2005), that the defendant officers "have a tacit

understanding to carry out the prohibited conduct," *United States v. Rubin*, 844 F.2d 979, 984

(2d Cir. 1988).  *See also Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970) (defendants'

"failure to foreclose the possibility that [they] . . . reached an understanding" should have

precluded summary judgment on plaintiff's conspiracy claim).

 Evidence of a cover-up is probative of whether there was a conspiracy.  *See, e.g.*,

*Ricciuti*, 124 F.3d at 131 (defendant officer's distribution of "a confession he knew to be false"

and his co-defendant officer's "l[ying] about the circumstances surrounding plaintiff's arrest"

were evidence of a cover-up sufficient to show an "agreement" to conspire) (reversing the

district court's dismissal of plaintiff's § 1983 conspiracy claim on summary judgment); *Hill*,

2005 U.S. Dist. LEXIS at *16-17 (denying summary judgment on plaintiff's conspiracy claim

because "the circumstantial evidence . . . does suggest that there was an agreement between state

actors to falsify testimony and cover-up an unconstitutional use of excessive force.").  "Once a

conspiracy is shown to exist, the evidence sufficient to link another defendant to it need not be

overwhelming."  *LeBlanc-Sternberg v. Fletcher*, 143 F.3d 765, 770 (2d Cir. 1998) (citation and

quotation marks omitted).

Here, there is ample evidence of a conspiracy, particularly when "examin[ing] the evidence in the light most favorable to, and draw all inferences in favor of [Plaintiff]," the non-movant. *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002). The CO Defendants were the only persons who could possibly have caused Mr. Taylor's extensive, fatal injuries, and some combination of these officers was with him from the moment he left his cell until he arrived at the infirmary in a lifeless state approximately 25 minutes later. Ex. 12 at 117:12-20. Mr. Taylor's injuries simply could not have occurred without some "mutual understanding" or "concerted action." *Puglisi*, 947 F. Supp. at 704.

Despite this inescapable reality, the CO Defendants have repeatedly covered-up their involvement in Mr. Taylor's death with one implausible untruth after another. They claim, for example, that there was no blood in the hallway,[15] despite testimony and affidavits of three disinterested eye-witnesses, as well as prison records attesting that blood was cleaned for three hours the morning of April 13, 2015. Exs. 22-24. They claim that Mr. Taylor's fractured Adam's Apple was caused by his shirt "bunching up."[16] And their testimony and written statements concerning the events of April 13, 2015 offer no explanation for Mr. Taylor's injuries. They also attempted to avoid detection by beating Mr. Taylor in the hallway, out of the view of most inmates, cameras, and other prison staff, and they instructed inmates to "get off

---

[15] Ex. 10 at 46:13-47:3 ("Q. And so is it correct that at no point did you see any visible injuries to Mr. Taylor? A. That is correct. Q. And at no point you saw any blood coming from Mr. Taylor? A. That is correct. Q. And at no point did you see Mr. Taylor in any visible medical distress? A. Correct.); Ex. 19 at 105:5-7 ("Q. Well, do you recall any blood being in the hallway? A. I don't.").

[16] *Compare* Ex. 15 at 74:17-75:6 ("I noticed that his shirt was bunching up, and I said to inmate Taylor I said is this tight on you? And he was like (indicating) yes, and he was like making this noise so I . . . cut his shirt as the officer that was in the room reached under his sweat shirt and popped the buttons on his shirt to open up his collar and then he said oh, thanks, man. I appreciate it, and so we had a little bit of a conversation.") *with* Hua Rep. at 4 ("Mr. Taylor's neck compression injuries could [not] have been caused by tight clothing bunched around his neck.").

their gates" in the E North cell block, Ex. 6 at 111:2-3, or to "turn and face the wall" so that they

could not "see what they have done to Mr. Taylor," Ex. 4 at 30:2-13.

In addition, the CO Defendants had ample opportunity to coordinate their narratives

about the events of April 13, 2015 in the immediate aftermath of Mr. Taylor's death, before

offering any statement to prison officials or investigators.  Coordination began in the Sullivan

infirmary when Defendants Tucker and Witte told Defendant Weir that Mr. Taylor had started

the fight, *see* Ex. 11 at 82:7-25, and continued in the Chart Room, where seven of the eleven CO

Defendants congregated before preparing written statements, Ex. 18 at 184:14-25; Ex. 14 at

126:19-128:14, and discussed what they would write, Ex. 18 at 183:7-184:7, 186:25-187:2.  At

least one of the CO Defendants shredded an earlier draft of his report.  *Id.* at 183:7-184:7,

186:25-187:2.  Finally, the CO Defendants exchanged at least 18 phone calls in the ten days

following Mr. Taylor's death.  Ex. 30.

Plaintiff has shown, at minimum, circumstantial evidence sufficient for a jury to "infer"

that the CO Defendants had "a tacit understanding to carry out the prohibited conduct."  *Hill*,

2005 U.S. Dist. LEXIS at *16-17; *Rubin*, 844 F.2d at 984.  The CO Defendants' argument that

"Plaintiff's conspiracy claims are simply conclusory and unsubstantiated," CO Br. at 9, is

meritless.

## C.     There is Ample Evidence that the CO Defendants Conspired to Deny Mr. Taylor Equal Protection of the Law

The CO Defendants also move for summary judgment dismissing Plaintiff's § 1985(3)

claim on the theory that "no allegations have been made in which any [] Correction Officer is

referred to [other than CO Tucker], by name or inference, in connection with or any racist act or

statement."  CO Br. at 14.  Their argument is wrong on the law and wrong on the facts.

To prevail on a claim under § 1985(3), a plaintiff must prove, *inter alia*, "depriv[ation] [of] a person or class of persons of the equal protection of the laws, or the equal privileges and immunities of the laws." *Thomas v. Roach*, 165 F.3d 137, 146 (2d Cir. 1999). Generally, a plaintiff challenging law enforcement conduct on equal protection grounds "must demonstrate that . . . he was treated differently from other similarly-situated individuals." *Vilkhu v. City of N.Y.*, No. 06-cv-2095, 2008 U.S. Dist. LEXIS 36454, at *14 (E.D.N.Y. May 5, 2008). While the use of racial slurs alone does not typically rise to a constitutional deprivation, *Purcell v. Coughlin*, 790 F.2d 263, 265 (2d Cir. 1986), the use of racial slurs in conjunction with physical abuse gives rise to a cognizable claim under § 1985(3). *Cole v. Fischer*, 379 F. App'x 40, 43 (2d Cir. 2010) ("When the verbal harassment and simultaneous physical abuse . . . are considered together, we have little trouble concluding that plaintiff's allegations were sufficient to state [an equal protection] claim for discrimination on the basis of race and religion.") (summary order); *see also Baskerville v. Goord*, No. 97-cv-6413, 1998 U.S. Dist. LEXIS 17603, at *23 (S.D.N.Y. Nov. 5, 1998) ("Where, however, such statements are shown to be connected with physical injury, an [equal protection] claim may indeed lie.") *aff'd sum nom., Baskerville v. Mulvaney*, 411 F.3d 45 (2d Cir. 2005).

Here, COs treated Mr. Taylor, an African-American man, "different[ly]" from the moment he arrived at Sullivan. Ex. 3 at 57:9-21. These COs, and Defendant Tucker in particular, would call Mr. Taylor "nigger [and] monkey." Ex. 4 at 38:17-25. *See also* Ex. 3 at 38:7-39:7; Ex. 5 at 61:16-63:12. This background offers important context for what followed: a group of Caucasian or Hispanic CO Defendants shouting racial epithets as they inflicted a fatal beating and choking on a handcuffed African-American man. *See, e.g.*, Ex. 4 at 24:10-13, 25:8-20. These facts alone are sufficient for a triable equal protection claim under § 1985(3), and

certainly, a conspiracy under § 1985(3) to violate Mr. Taylor's equal protection rights. *See Cole*, 379 F. App'x at 43; *Baskerville*, 1998 U.S. Dist. LEXIS at *23. Plaintiff's § 1985(3) cause of action should be resolved at trial.

## IV.    Qualified Immunity Is Inapplicable

All the CO Defendants aside from Tucker argue they are entitled to qualified immunity because they "do not know what specific acts they are accused of committing, much less how they might defend against such amorphous charges." CO Br. at 15. The allegations in Plaintiff's Second Amended Complaint against the CO Defendants—that they beat and choked her restrained brother to death—are abundantly clear, and borne out by the evidence in this case.

Regardless, this doctrine cannot serve as grounds for summary judgment. Qualified immunity protects government officials "when [they] did something that was arguably unconstitutional, and when the United States Supreme Court or the Second Circuit has not yet settled the legality of the conduct in that particular factual context." Individual Rules & Practices of the Honorable Colleen McMahon at 12. *See also Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Overcoming qualified immunity requires a plaintiff to allege (1) a violation of a "clearly-established constitutional or statutory right" and (2) that a "reasonable official" would know that the alleged misconduct violated that "established right." *Thomas v. Roach*, 165 F.3d 137, 142-43 (2d Cir. 1999). The only way that the CO Defendants can prevail on qualified immunity grounds at summary judgment is to show "***the only*** result a jury could reach is that reasonable [] officers could disagree about whether the force used against [the plaintiff] was excessive." *Id.* at 143 (emphasis added). Of course, Mr. Taylor's unexplained injuries, incurred after he was restrained, preclude such a finding.

For this reason, case law disfavors post-discovery qualified immunity arguments. *See* Individual Rules & Practices of the Honorable Colleen McMahon at 12 ("Please do not invoke

qualified immunity when you are really asserting that your client is entitled to judgment 'because he did nothing wrong.'"). *See also Lloyde v. Lord*, No. 94-cv-484, 1997 U.S. Dist. LEXIS 2978, at *9-10 (S.D.N.Y. March 19, 1997) (denying summary judgment on qualified immunity grounds because the court "cannot conclude as a matter of law that [officers'] conduct was objectively reasonable."); *Ali v. Szabo*, 81 F. Supp. 2d 447, 461-62 (S.D.N.Y. 1999) (citing cases).  Here, qualified immunity is inapplicable.

## CONCLUSION

This Court should deny the CO Defendants' motion for summary judgment.


Dated: June 5, 2019                    Respectfully submitted,

                                       PATTERSON BELKNAP WEBB & TYLER LLP

                                       */s/ Eugene M. Gelernter*
                                       Eugene M. Gelernter
                                       Adeel A. Mangi
                                       Daniel M. Eisenberg
                                       1133 Avenue of the Americas
                                       New York, New York 10036
                                       Telephone: (212) 336-2000
                                       emgelernter@pbwt.com
                                       aamangi@pbwt.com
                                       dmeisenberg@pbwt.com

                                       *Attorneys for Plaintiff Julia Ramsay-Nobles,*
                                       *Individually and as Administratrix of the Estate of*
                                       *Karl Taylor*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 5th day of June 2019, the foregoing was served on all counsel of record by operation of this Court's Electronic Filing System.


By: */s/ Eugene M. Gelernter*